STATE v. MARR

[113 N.C. App. 774 (1994)]

STATE OF NORTH CAROLINA v. DANIEL C. MARR

No. 9329SC301

(Filed 1 March 1994)

**Criminal Law § 49 (NCI4th) — murder — accessory before the fact — plan to steal property — guilty**

The trial court did not err by denying defendant's motions to dismiss charges of accessory before the fact to first-degree murder, first-degree burglary, armed robbery, and first-degree arson where an accomplice testified that the only purpose in going to the property was to steal items and there was no murder, arson, or robbery planned. Once an accessory before the fact has counseled, procured or planned a criminal event, he or she must answer for all crimes flowing from the accomplished event.

**Am Jur 2d, Criminal Law § 172.**

Appeal by defendant from judgment entered 9 July 1992 by Judge Chase B. Saunders in Polk County Superior Court. Heard in the Court of Appeals 29 November 1993.

At trial, the State presented evidence which tended to show that Shane Smith and Jimmy Jaynes committed breaking and enterings in Polk and Henderson Counties in 1990. In September of 1990, Smith and Jaynes went with defendant to the Paul Acker property.

Smith testified that defendant furnished information about Mr. Acker's property to him and Jaynes so that they could rob Mr. Acker. When the three men arrived at the property, defendant told Jaynes and Smith that they should not drive on Fowler Road because there were older people who lived on the road and kept watch. Defendant described a building and a trailer on the property that were fully equipped with tools. Defendant told Smith and Jaynes about certain habits of Mr. Acker, such as when he went out of town and when he left his home. Defendant told the men about barking dogs on the property. Defendant told them that Mr. Acker never locked his doors and that when he left his home, his trailer was unlocked and unsecured. He told them that there were tractors, bulldozers, and two automobiles on the property and that Mr. Acker left the keys in these vehicles.

Smith testified that defendant told him and Jaynes that defendant knew about Mr. Acker's property and habits because he had worked there cutting timber while he was in the Spindale Prison unit. Defendant told Smith that he wanted several tools from Mr. Acker's property, including an air compressor, welder and other common shop tools. Defendant told Smith and Jaynes that he could not take the tools himself because he was just released from prison and was on parole.

Smith and Jaynes went back to the Acker property in early October. The two men made a total of four trips to the property together. During these four trips, Jaynes and Smith went into the mobile home and the shop on two occasions.

On 10 October 1990, Smith and Jaynes met each other at Smith's place of employment in Rutherford County. Later that evening, they travelled to Mr. Acker's home. Jaynes carried a .25 caliber pistol and a .22 rifle. Smith testified that if they were caught on the property and asked what they were doing, they had planned to say that they were deer hunting.

Smith testified that no lights were on in the trailer, but that both of Mr. Acker's automobiles were there. Smith went to the back of the trailer and Jaynes went to the front. Jaynes knocked on the front door and then banged and yelled for someone to come to the door. Smith heard a gunshot while he was still at the back of the trailer.

Smith went to the trailer's front porch, where he saw Jaynes standing over Mr. Acker's motionless body. Jaynes pulled from his shoe the .25 caliber pistol, aimed it at Mr. Acker and fired twice. Jaynes then handed the gun to Smith, who raised his arms, closed his eyes and fired the weapon in Mr. Acker's direction. After firing the weapon at Mr. Acker, Smith threw the gun down and ran out the door. Once outside, Smith heard two more shots. Smith and Jaynes went back inside the trailer, and Jaynes covered Mr. Acker's body. The two men loaded Mr. Acker's Volvo and the truck they drove with items from Mr. Acker's trailer. They then left the residence and went to Crutchfield Road in Rutherford County. The men left the Ford truck there and drove the Volvo back to the Acker property to get Smith's automobile.

When they returned to the property, Jaynes took a container of gasoline from Mr. Acker's shed. Jaynes told Smith to meet

him at the bottom of the hill. Smith started down the hill and saw flames coming from the residence. The two then left the property a second time, with Jaynes still driving the Volvo and Smith now driving his own car. They left the Volvo off Nantytown Road in Rutherford County. Smith took Jaynes to his grandmother's house in Rutherford County.

Smith saw Jaynes again on 12 October 1990. They agreed to get the truck and put the stolen items in a barn off Oak Springs Road. They then took the truck back to its original location on Crutchfield Road.

On 13 October 1990, Jaynes and Smith went to defendant's home, but defendant was not there. They drove back to where they had hidden the Volvo, and Rutherford County sheriffs were there to arrest them.

The forensic pathologist testified that the cause of death to Mr. Acker was two gunshot wounds to the head and that Mr. Acker was dead before the fire started.

The defendant presented evidence that Clay Nelon had had conversations with Shane Smith while in the Polk County Jail, and that Smith had told Nelon that "all Dan [Marr] had to do with it was take him over there and get him permission to hunt on Paul's property."

Jimmy Jaynes testified that defendant is his uncle by marriage. Jaynes testified that he and defendant never had a conversation about breaking into the mobile home of Mr. Acker, nor about taking items of personal property belonging to Mr. Acker. Jaynes denied that defendant ever told them anything about Mr. Acker's property. Jaynes denied picking up defendant and going to Polk County with him and Shane Smith.

After a trial by jury, defendant was found guilty of accessory before the fact to first degree murder, accessory before the fact to first degree burglary, accessory before the fact to robbery with a dangerous weapon, accessory before the fact to felonious entering a dwelling house, accessory before the fact of larceny pursuant to entering a dwelling house, accessory before the fact to felonious entering of a building, accessory before the fact to felonious larceny pursuant to entry of a building, accessory before the fact to first degree arson of a mobile home, and accessory before the fact to two counts of larceny of a motor vehicle. Defendant was sentenced

to three consecutive three-year terms, one consecutive ten-year term, one consecutive forty-year term, two consecutive fifty-year terms, and one term of life in prison. Defendant now appeals.

*Attorney General Michael F. Easley, by Special Deputy Attorney General James C. Gulick, for the State.*

*Brent Conner for defendant-appellant.*

WELLS, Judge.

Defendant argues, *inter alia*, that the trial court erred by refusing to grant his motion to dismiss the charges of accessory before the fact to first degree murder, first degree burglary, armed robbery, and first degree arson.

Defendant contends that there was insufficient evidence that he instigated, counseled or procured principals Smith and Jaynes to commit armed robbery, burglary, murder or arson to let those charges go to the jury. He argues that these crimes are entirely different from the planned crimes of stealing property from Paul Acker's shop and mobile home, and thus there was no causal connection between his actions and the actions of the principals in committing the crimes as required by *State v. Davis*, 319 N.C. 620, 356 S.E.2d 340 (1987).

When a defendant moves for dismissal, the court must determine whether there is substantial evidence (a) of each essential element of the offense charged, or of a lesser included offense, and (b) of defendant's being the perpetrator of the offense. *State v. Earnhardt*, 307 N.C. 62, 296 S.E.2d 649 (1982). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 265 S.E.2d 164 (1980).

Defendant was indicted for wrongs allegedly committed by him as an accessory. In order to convict the defendant of being an accessory before the fact the State was required to prove (1) that defendant counseled, procured, commanded, encouraged, or aided another to commit the offense; (2) defendant was not present when the crime was committed; and (3) the principal committed the crime. *See generally State v. Davis, supra,* (murder); *State v. Fletcher*, 66 N.C. App. 36, 310 S.E.2d 787, *disc. rev. denied*, 310 N.C. 627, 315 S.E.2d 693 (1984). With respect to the crimes of murder, burglary, and arson in this case, Smith's testimony

tends to exonerate defendant. Smith testified that the only purpose for going to the Acker property on 11 October 1990 was to steal items from the mobile home and the shop, and that there was "no murder planned, no arson, no robbery. . . ." To the extent which Smith's testimony tended to exculpate defendant, the State is bound by it. *See generally State v. Horton*, 275 N.C. 651, 170 S.E.2d 466, *cert. denied*, 398 U.S. 959, 26 L.Ed.2d 545, *reh'g denied*, 400 U.S. 857, 27 L.Ed.2d 97 (1970).

The inquiry does not end there, however. With respect to the guilt of accused accessories, our appellate courts have held that accessories may be held accountable not only for the crimes they counsel or procure, but also for any other crimes committed by the principal which are the natural or probable consequence of the common purpose. *State v. Ruffin*, 90 N.C. App. 705, 370 S.E.2d 275 (1988); *State v. Hewitt*, 33 N.C. App. 168, 234 S.E.2d 468 (1977). That, of course, is a standard more easily stated than applied. For example, in a civil case, one court has defined "natural or probable" consequences as follows: "Those consequences that a person by prudent human foresight can anticipate as likely to result from an act, because they happen so frequently from the commission of such an act that in the field of human experience they may be expected to happen again." *Pope v. Pinkerton-Hays Lumber Co.*, 120 So.2d 227, *cert. denied*, 127 So.2d 441 (1961).

However, we find the dispositive standard to be somewhat at variance with the "natural and probable" consequence standard relied upon by the State. The requirement for conviction of an accessory before the fact is that the State must prove beyond a reasonable doubt that the action or statements of the defendant somehow caused or contributed to the actions of the principal. *See State v. Davis*, 319 N.C. 620, 356 S.E.2d 340 (1987). Generally, there is not a great deal of dispute over whether an accessory's words or acts caused or contributed to the actions of the principal. *See State v. Sams*, 317 N.C. 230, 345 S.E.2d 179 (1986); *State v. Woods*, 307 N.C. 213, 297 S.E.2d 574 (1982). Rather, the factual issue is more likely to focus on whether the accesory "counseled, procured, or commanded the principal *at all*." (Emphasis added.) *State v. Hunter*, 290 N.C. 556, 227 S.E.2d 535 (1976); *cert. denied*, 429 U.S. 1093, 51 L.Ed.2d 539 (1977). *See also State v. Davis, supra.*

Our review of the accessory cases indicates that where crimes of intent are involved, the accused accessory typically did or said

something which would tend to show that he at least anticipated that the plan he encouraged might lead to the "consequential" crime in question. The reasoning of our Supreme Court in the cases we have cited above, however, clearly indicates under our law that once an accessory before the fact has counseled, procured or planned a criminal event, he must answer for all crimes flowing from the accomplished event.

We have carefully reviewed defendant's other assignment of error and find no merit in his argument.

No error.

Chief Judge ARNOLD and Judge EAGLES concur.